UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -X

ANDREA T. PAYNE,

                 Plaintiff,

     - against -

EMPLOYING OFFICE OF
REPRESENTATIVE GREGORY W. MEEKS,

                 Defendant.

CV-01-1532
(Korman, C.J.)
(Levy, M.J.)

- - - - - - - - - - - - - - - - - - - -X

## STATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York, Defendant Employing Office of Representative Gregory W. Meeks ("Defendant" or "Office"), by its attorney, Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Sandra L. Levy, Assistant United States Attorney, of counsel, submits the following statement of material facts as to which Defendant contends there exists no genuine issue to be tried in connection with Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56(c):

## I. Plaintiff's Employment at the Office of Representative Meeks

### A. Background

1.  Effective March 23, 1998, Plaintiff started work as a Community Liaison in the Office of Representative Gregory W. Meeks ("Rep. Meeks") at an annual salary of $28,000. Declaration of

Jameel Aalim-Johnson, dated December 1, 2004 ("A-Johnson Dec.") ¶ 4, and Exhibit ("Ex.") A thereto; Declaration of Sandra L. Levy, dated December 2, 2004 ("Levy Dec."), Ex. 3 (Deposition of Plaintiff, taken on November 7, 2002 ("Pl. Dep. I")), at 28:19-22.

2.  Plaintiff was assigned to the District Office, located at 196-06 Linden Boulevard, St. Albans, New York.  A-Johnson Dec. ¶ 5.

3.  Effective January 1, 1999, Plaintiff's annual salary was increased to $35,000.  A-Johnson Dec. ¶ 6, and Ex. B thereto.

4.  Effective January 1, 2000, Plaintiff's annual salary was increased to $36,395.  A-Johnson Dec. ¶ 7, and Ex. C thereto.

5.  Employees of the Office are paid monthly.  A-Johnson Dec. ¶ 10.

6.  Plaintiff's monthly base pay was calculated on the basis of one twelfth of her annual salary, not on an hourly basis.  Id.

7.  During the years of her employment Ms. Payne's monthly salary was as follows: $2,333.33 in 1998, $2,916.67 in 1999 and $3,024.58 in 2000. A-Johnson Dec. ¶ 11 and Ex. F thereto.

8.  During certain months between March 1998 and August 2000, Plaintiff was paid overtime compensation.  A-Johnson Dec. ¶ 12, and Ex. G thereto.

9.  On a single occasion in December 1998, Plaintiff received a bonus in the amount of $3,220.  A-Johnson Dec. ¶ 13, and Ex. H thereto.

10.  Plaintiff requested permission to leave the Office early

on certain occasions, _e.g._, due to medical or legal issues to which she had to attend.  A-Johnson Dec. ¶ 15 and Ex. I thereto.

11.   Nevertheless, Plaintiff's salary was not subject to reduction for partial-day absences, _i.e._, there was no actual practice of making pay deductions for partial-day absences, no employment policy indicating that pay deductions would be made for partial-day absences, and Plaintiff's salary was never so reduced. A-Johnson Dec. ¶¶ 14-16.

12.   Plaintiff's salary was not subject to reduction based on variations in the quality or quantity of her work, _i.e._, there was no actual practice of making pay deductions for variations in the quantity or quality of her work, no employment policy indicating that pay deductions would be made based on variations in the quality or quantity of her work, and Plaintiff's salary was never so reduced.  A-Johnson Dec. ¶¶ 17-18.

**B.   Plaintiff's Duties and Responsibilities**

13.   During her employment, Plaintiff served as one of five to seven Community Liaisons in the District Offices of Representative Meeks.  Levy Dec., Ex. 4 (Deposition of Rep. Meeks, taken on November 19, 2002 ("Rep. Meeks Dep.")), at 25:24-26:14; Declaration of Gregory W. Meeks, dated December 2, 2004 ("Rep. Meeks Dec.") ¶ 4.

14.   The District Offices are located in St. Albans, Richmond Hill, and Far Rockaway, New York.  Rep. Meeks Dec. ¶ 3.

15.  The District Offices are the direct connection between the Congressman and the community that he represents.  Id.

16.  The primary function of the District Offices is to serve as a clearinghouse where the approximately 655,000 constituents of the 6th Congressional District of New York may come to request assistance, and where the staff of the District Offices may respond to such requests, intervene on behalf of, and service the needs of, the district's constituents.  Id.; see id. ¶ 4.

17.  The District Offices also serve an important representational function, establishing the Congressman's presence in the community.  Id.; see id. ¶ 4.

18.  In her position as Community Liaison, Plaintiff handled constituent matters dealing with legal and law enforcement-related issues, grants, the Post Office, and occasionally Internal Revenue Service matters.  Levy Dec., Ex. 3 (Pl. Dep. I), at 29:1-20; Declaration of Patrick Jenkins, dated November 30, 2004 ("Jenkins Dec.") ¶ 7.

19.  Examples of requests for assistance that could be assigned to Ms. Payne in her subject area were citizens' claims of harassment by the police, or prisoners' claims of civil rights violations.  Jenkins Dec. ¶ 7.

20.  Plaintiff's work included face-to-face contact with constituents as well as contact by telephone and letter.  Id., at 34:13-35:8.

21.   Plaintiff was also required to attend meetings with community groups and associations as the Congressman's representative and speak on the Congressman's behalf. Rep. Meeks Dec. ¶¶ 5-6; Levy Dec., Ex. 3 (Pl. Dep. I), at 43:7-21.

22.   Plaintiff's performance of this duty was essential to Rep. Meeks' ability to fulfil his representational function. Rep. Meeks Dec. ¶ 5.

23. For example, Plaintiff attended:

(a) community council meetings for each of the five to six police precincts in the district on a monthly basis, Levy Dec., Ex. 3 (Pl. Dep. I), at 43:22-44:4, 44:11-13, 147:21-25; Rep. Meeks Dec. ¶ 6;

(b)  other meetings and events in the community that are intended to foster good relations between the police and members of the community, including meetings with the Patrol Bureau Queens South (which is comprised of the eight police precincts in South Queens), and picnics, luncheons, and other gatherings, Rep. Meeks Dec. ¶ 6; Levy Dec., Ex. 9 (documents produced by Plaintiff), at P100101-24 (mileage log reflecting attendance at "PBQS" and community events); see id., Ex. 3 (Pl. Dep. I), at 33:11-15 (Plaintiff testified that "[she] kept the mileage log in the car");

(c)  other community meetings and events, including monthly meetings of the Cambria Heights Civic Association and Community Board 10, Levy Dec., Ex. 3 (Pl. Dep. I), at 44:4-18, as well as meetings of other civic associations in the district, Rep. Meeks Dec. ¶ 6; id., Ex. 9 (documents produced by Plaintiff), at P100101-24 (mileage log reflecting attendance at civic association meetings);

(d)  meetings and fora about police brutality issues, domestic violence and elder crime, Rep. Meeks Dec. ¶ 6; Levy Dec., Ex. 9, at P100101-124 (mileage log reflecting attendance at meetings and fora); and

(e)  law and government programs at local high schools at which Plaintiff spoke in the Congressman's stead, Rep. Meeks Dec. ¶ 6 and Ex. B thereto (memos describing attendance at

school programs); Levy Dec., Ex. 9, at P100101-124 (mileage log reflecting attendance at schools).

24.  The "community councils" function as liaisons between the police and the community.  Rep. Meeks Dec. at pg. 3, n. 1; see Levy Dec., Ex. 3 (Pl. Dep. I), at 44:11-13.

25.  Among other things, Community Boards intercede on behalf of their constituents to ensure delivery of services and meet with agencies and elected officials to promote service delivery.  Rep. Meeks Dec. at pg. 3, n. 1.

26.  At all of the meetings with community groups and associations that Plaintiff attended as the Congressman's representative, Plaintiff interacted with constituents, listened to their concerns, and discussed the Congressman's policy positions in relation to those concerns.  Rep. Meeks Dec. ¶ 7; Jenkins Dec. ¶¶ 13-14.

27.  Plaintiff was briefed on what was important to the Congressman about particular issues that might arise at a meeting and given guidelines about what she could state on the Congressman's behalf at the meeting.  Jenkins Dec. ¶ 13.

28.  Plaintiff was required to exercise discretion in how she shared the Congressman's concerns at a meeting and Plaintiff was directed not to state her personal opinion on an issue when acting as the Congressman's representative.  Id.

29.  Plaintiff was required to prepare, and submit to the District Office Chief of Staff, a report describing each meeting

that she attended, any issues raised at the meeting, and her recommendations about policies or initiatives, if any. Rep. Meeks Dec. ¶ 8; see Levy Dec., Ex. 3 (Pl. Dep. I), at 87:9-15, 88:18-89:20, 144:1-10; Jenkins Dec. ¶ 15.

30.   The District Office Chief of Staff used the meeting reports to brief the Congressman on issues of concern to particular groups in the community. Rep. Meeks Dec. ¶ 8.

31.   The meeting reports helped Rep. Meeks determine, e.g., whether to advocate for legislation, and/or whether to do any education or outreach in the community about a particular issue. Id.

32.   Plaintiff's work in the local community was extremely important to the Office. Rep. Meeks Dec. ¶ 9.

33.   For example, at the time she was employed by the Office, there were several alleged incidents of police brutality in the 6th Congressional District of New York that were receiving national attention from the media and advocacy groups.   Id.   On one occasion, Plaintiff brought individuals from the local police precincts, including Captains, Commanders, and Sergeants, to meet with the Congressman regarding incidents of alleged police brutality. Id. Plaintiff planned, participated in, and played an integral role in, these meetings between the Congressman and the community. Id.

34. Plaintiff also worked in conjunction with advocacy groups

in planning and organizing hearings on police brutality. Rep. Meeks Dec. ¶ 10; Levy Dec., Ex. 10 (resume of Plaintiff); Levy Dec., Ex. 11 (Deposition of Plaintiff, taken on November 6, 2003 ("Pl. Dep. II"), at 188:8-189:23 (at her deposition, Plaintiff authenticated the resume identified found at Levy Dec., Ex. 10, and testified that she prepared the resume in or around October 2000, after her termination).

35. On one occasion in particular, Plaintiff participated in the logistical planning and organization of Congressional Black Caucus public hearings on police brutality at the World Trade Center. Rep. Meeks Dec. ¶ 10; Levy Dec., Ex. 10 (resume of Plaintiff).

36. Plaintiff also mediated community tensions around concerns about incidents of alleged policy brutality. Rep. Meeks Dec. ¶ 11.

37. In one instance, Plaintiff managed conflict between angry constituents and police officers from a local precinct who were at odds with each other during a community meeting over an alleged incident of police brutality. Id. The meeting was held to discuss an incident where a law enforcement officer had shot and killed a constituent because the officer mistakenly believed that the constituent was carrying a gun, when the object the constituent was carrying was a candy bar. Id. Plaintiff was particularly effective at managing tensions and conflict during that meeting and

represented the Office well.   Id.

38.  On one occasion, Plaintiff represented the Congressman at a funeral for a constituent who had been murdered.  Levy Dec., Ex. 3 (Pl. Dep. I), at 147:4-20.  According to Plaintiff, "it was very high profile and had been publicized in the news, and I was asked to read condolence remarks at the funeral on behalf of the Congressman."  Id.

39.  Plaintiff was also required to respond to requests for assistance from constituents concerning her designated subject areas.  Rep. Meeks Dec. ¶ 13; Levy Dec., Ex. 3 (Pl. Dep. I), at 29:2-20, 34:13-35:8; Levy Dec., Ex. 10 (resume of Plaintiff); see generally Rep. Meeks Dec. ¶ 4.

40.  In her capacity of responding to requests for assistance from constituents, if Plaintiff knew how to respond to an inquiry without researching an issue further, she would recommend a course of action directly to the constituent, free from immediate supervision and direction.  Rep. Meeks Dec. ¶ 13; see Jenkins Dec. ¶ 9.

41.  If Plaintiff did not know how to respond to a request for assistance from a constituent without further follow-up, she would determine how to investigate the issue, which included evaluating different possible methods of addressing a constituent's problem. Rep. Meeks Dec. ¶ 13; see Jenkins Dec. ¶ 9.

42.  When the Office could intervene on behalf of a

constituent to help solve a problem or dispute with a government agency, Plaintiff acted as liaison for the constituent before federal, state, and local government agencies.  Id.

43.  Plaintiff would then respond accordingly to the constituent's request for assistance.  Id.

44.  When organizations sought funding, Plaintiff directed them to appropriate federal funding sources and prepared letters of support for the funding.  Levy Dec., Ex. 10 (resume of Plaintiff); Jenkins Dec. ¶ 11.

45.  Plaintiff also assessed the issues and problems that were raised at community meetings that she attended and the constituent case work that she handled and reported any trends in such issues to the District Office Chief of Staff.  Rep. Meeks Dec. ¶ 14; Jenkins Dec. ¶ 16.

46.  Although Plaintiff did not formulate policy, on the basis of her analyses of the issues and problems that were raised at community meetings and in Plaintiff's case work, Plaintiff made recommendations to the District Office Chief of Staff regarding the need for legislative policy and/or community initiatives.  Rep. Meeks Dec. ¶ 14; see Jenkins Dec. ¶ 14.

47.  On one occasion, Plaintiff recognized a trend of identity theft cases in her case work, and proposed that the Office take action on behalf of the community.  Jenkins Dec. ¶ 16.

48.  Rep. Meeks acted on Plaintiff's proposal that the Office

take action on behalf of the community concerning identity theft and the Office publicized the issue, including television coverage. Id.; see also Levy Dec., Ex. 3 (Pl. Dep. I), at 122:18-123:7 (Plaintiff described working on television coverage of identity theft issue).

49. Plaintiff also composed and prepared proclamations. Rep. Meeks Dec. ¶ 15; Levy Dec., Ex. 3 (Pl. Dep. I), at 38:11-12; Levy Dec., Ex. 10 (resume of Plaintiff).

50. A "proclamation" is a recognition of the accomplishments of a particular individual or entity, and is issued on behalf of Rep. Meeks as a member of the United States House of Representatives. Rep. Meeks Dec. at pg. 6, n.2.

51. In order to compose and prepare proclamations, Plaintiff researched the individual or entity to whom the proclamation was being given and drafted the text of the proclamation. Rep. Meeks Dec. ¶ 15.

52. Plaintiff then had the proclamation produced and framed and presented it to the individual or entity in question on the Congressman's behalf. Id.; Levy Dec., Ex. 3 (Pl. Dep. I), at 38:12-14.

53. Plaintiff also acted as systems administrator for the District Office. Levy Dec., Ex. 3 (Pl. Dep. I), at 35:9-19; Levy Dec., Ex. 10 (resume of Plaintiff); Rep. Meeks Dec. ¶ 16.

54. As systems administrator, Plaintiff troubleshot technical

problems; maintained the computer systems for the three District
Offices; and printed a monthly caseworker intake report for the
District Office Chief of Staff. Levy Dec., Ex. 3 (Pl. Dep. I), at
35:20-36:4; Levy Dec., Ex. 10 (resume of Plaintiff).

55.  Plaintiff's responsibility as system administrator was
secondary to the performance of Plaintiff's duties as Community
Liaison. Rep. Meeks Dec. ¶ 16.

56.  According to Plaintiff, her systems administration work
accounted for approximately 40 percent of her time. Levy Dec., Ex.
3 (Pl. Dep. I), at 35:15-19.

57.  Plaintiff's direct supervisor was District Office Chief
of Staff Josephine Johnson.  Jenkins Dec. ¶ 4.

58.  Ms. Johnson passed away in July 2002. <u>Id.</u>

59.  Ms. Johnson was available for consultation with Plaintiff
and the other Community Liaisons in their work, <u>e.g.</u>, in
determining how to respond to constituent inquiries. Rep. Meeks
Dec. ¶ 17; <u>see</u> Levy Dec., Ex. 3 (Pl. Dep. I), at 115:9-19
(Plaintiff testified about consulting with Ms. Johnson in
responding to inquiries).

60.  Often, it was left to Plaintiff's judgment to determine
when to consult Ms. Johnson on an issue.  Rep. Meeks Dec. ¶ 17;
<u>see</u> Jenkins Dec. ¶ 10.

61.  Ms. Johnson reviewed all letters drafted by Community
Liaisons, including Plaintiff, before they were sent. Rep. Meeks

Dec. ¶ 18; Jenkins Dec. ¶ 12; Levy Dec., Ex. 3 (Pl. Dep. I), at 114:21-115:5.

62.  Ms. Johnson reviewed the letters drafted by Community Liaisons for quality control, to ensure that the letters were grammatically correct and professional in appearance. Rep. Meeks Dec. ¶ 18; Jenkins Dec. ¶ 12.

63.  Ms. Johnson also reviewed letters drafted by Community Liaisons to ensure that the approach taken in dealing with a constituent's request for assistance was correct. Rep. Meeks Dec. ¶ 18; Jenkins Dec. ¶ 12.

64.  Plaintiff's letters were often accepted without revision beyond non-substantive edits. Rep. Meeks Dec. ¶ 18.

65.  In the year 2000, Plaintiff worked from 9 to between 5:15 and 5:30 every weekday except Thursday, when she worked until 8:00. Levy Dec., Ex. 3 (Pl. Dep. I), at 36:5-20.

66.  Plaintiff took one hour for lunch each day. Levy Dec., Ex. 3 (Pl. Dep. I), at 37:2-5.

**C.  <u>Office Overtime Policy</u>**

67.  Shortly after Rep. Meeks' election in February 1998, the Office established a policy of paying employees overtime compensation for representing the Office at meetings outside of office hours. Levy Dec., Ex. 4 (Rep. Meeks Dep.), at 17:2-18:5, 19:13-20:1; A-Johnson Dec. ¶ 19.

68.  In order to obtain overtime compensation, an employee was

required to submit a summary of the meeting, including the hours of attendance, to the Chief of Staff for the District Office. Levy Dec., Ex. 3 (Pl. Dep. I), at 87:9-15, 88:18-89:20, 144:1-10.

69. In order to obtain overtime compensation, an employee was also required to submit a monthly request for overtime compensation to the Chief of Staff for the District Office, which included an itemization of the hours worked during the month. Id. (Pl. Dep. I), at 90:11-15.

70. The District Office Chief of Staff then transmitted requests for overtime compensation by District Office staff to Patricia Fisher, the Office Manager/Scheduler for the Office who, among other things, processed the payroll for the employees of the Office. Levy Dec., Ex. 8 (Fisher Dep.), at 11:24-13:5.

71. Ms. Fisher then typed the information onto an Overtime Pay Sheet, which was required to be submitted to the U.S. House of Representatives Office of Finance, Payroll Department ("finance office"), no later than the tenth of the month following the month in which the overtime was incurred. Declaration of Patricia Fisher, dated December 1, 2004 ("Fisher Dec.") ¶ 4, and Ex. A thereto; see generally Levy Dec., Ex. 8 (Fisher Dep.), at 11:16-16:2 (description of overtime procedure).

72. Community Liaisons, including Plaintiff, were not required to complete a time sheet or otherwise account for their hours. Levy Dec., Ex. 3 (Pl. Dep. I), at 141:13-18.

73.   The only time Community Liaisons accounted for their hours was when they submitted a request for overtime compensation to the District Office Chief of Staff, which included the hours they claimed to have worked overtime.  Id.; id. (Pl. Dep. I), at 90:11-15.

**D.  Plaintiff's Attendance at February 2000 Meeting**

74.   On February 3, 2000, Plaintiff acted as the Congressman's representative at a meeting at the Humanities and the Arts Magnet High School, in Cambria Heights, Queens.  Levy Dec., Ex. 3 (Pl. Dep. I), at 87:3-11; id., Ex. 1 (Original Complaint)("Orig. Complt."), Ex. B; repeated at Rep. Meeks Dec., Ex. B (P100007).

75.   Plaintiff attended the meeting at Humanities and the Arts Magnet High School on February 3, 2000, from 5:00 to 7:30 p.m. Levy Dec., Ex. 3 (Pl. Dep. I), at 92:8-19; Levy Dec., Ex. 1 (Orig. Complt.), Ex. D.

76.   On February 4, 2000, Plaintiff drafted a memorandum summarizing the meeting, which she submitted to her supervisor, Josephine Johnson.  Levy Dec., Ex. 3, at 87:9-89:20; Levy Dec., Ex. 1 (Orig. Complt.), Ex. B.

77.   Plaintiff did not submit a request for overtime compensation to the Chief of Staff of the District Office by the tenth of the following month (i.e., March 10, 2000) for the two and one half hours at which she attended the meeting at Humanities and the Arts Magnet High School on February 3, 2000.  Fisher Dec. ¶ 5;

Levy Dec., Ex. 2 (Amended Complaint ("Am. Complt.")), Ex. A at 1 (Plaintiff indicated that she did not submit a request for overtime compensation by March 10, 2000).

78.   Plaintiff does not recall how many hours she worked during the week commencing January 30, 2000 and has no records to that effect.  Levy Dec., Ex. 3 (Pl. Dep. I), at 139:23-140:16.

79.   Plaintiff did not work on Sunday, January 30, or Saturday, February 5, 2000.  Id. (Pl. Dep. I), at 177:6-178:9; Fisher Dec. ¶ 6 (Plaintiff did not request overtime compensation for January 30 or February 5, 2000).

80.   Plaintiff testified that she was "not sure" how many hours she worked on Friday, February 4, but it could have been until 6:00.  Levy Dec., Ex. 3 (Pl. Dep. I), at 140:12-141:4.

**E.   Plaintiff's Paid Medical Leave - February to July 2000**

81.   On February 14, 2000, Plaintiff was injured in an automobile accident unrelated to her employment.  Levy Dec., Ex. 3 (Pl. Dep. I), at 52:23-53:10; Rep. Meeks Dec. ¶ 19; Fisher Dec. ¶ 7.

82.   Plaintiff was absent from work as a consequence of her automobile accident from February 14 to July 10, 2000.  Levy Dec., Ex. 2 (Am. Complt.) ¶¶ 16, 17; Fisher Dec. ¶ 7, and Ex. B thereto.

83.   As of February 14, 2000, Plaintiff had available approximately two and one half days of vacation leave and two days of sick leave.  A-Johnson Dec. ¶ 23.

84. During the first four and one half days of her absence from the office, Plaintiff was paid through use of her accrued sick leave and annual leave. Id.

85. At Rep. Meeks' direction, from the time that Plaintiff's accrued leave ran out on February 18, 2000, until Plaintiff's return to the Office four and one half months later on July 10, 2000, the Office paid Plaintiff her full salary, without interruption. Levy Dec., Ex. 4 (Rep. Meeks Dep.), at 70:13-71:13; Rep. Meeks Dec. ¶ 20; A-Johnson Dec. ¶ 23.

86. During Plaintiff's absence from the Office from February 14 to July 10, 2000, Plaintiff was paid a total of approximately $16,600 in salary - of which all but four and one half days of accrued leave were paid at Rep. Meeks' discretion. A-Johnson Dec. ¶ 23.

87. Effective March 29, 2000, the Office hired a new employee as a full-time Community Liaison, Joe Edwards, for the purpose of carrying out Plaintiff's duties as a Community Liaison during her absence, at an annual salary of $30,000. A-Johnson Dec. ¶ 24; Rep. Meeks Dec. ¶ 21.

88. When Plaintiff returned to work on July 10, 2000, Joe Edwards was asked to find a new position, but was told that he could continue to work at the Office of Rep. Meeks until he did so. Rep. Meeks Dec. ¶ 22.

89. On or about September 18, 2000, Joe Edwards left his

position as Community Liaison for the Office of Representative Meeks for employment elsewhere.  A-Johnson Dec. ¶ 25; Rep. Meeks Dec. ¶ 23.

90.   During his period of employment from March 29 to September 18, 2000, Joe Edwards was paid a total of approximately $14,100, of which approximately $8,400 was paid during the time that Plaintiff was on leave.  A-Johnson Dec. ¶ 25.

**F.  Denial of Plaintiff's Overtime Compensation Claim**

91.   Upon her return from medical leave, on July 11, 2000, Plaintiff submitted a request to Josephine Johnson for overtime compensation for the two and one half hours that she had attended a meeting on February 3, 2000.  Levy Dec., Ex. 3 (Pl. Dep. I), at 92:3-19; id., Ex. 1 (Orig. Complt.), Ex. D thereto.

92.  Ms. Johnson advised Plaintiff, among other things, that the overtime compensation request could not be submitted because it was submitted late (i.e., after the 10th of the following month, or March 10, 2000).  Levy Dec., Ex. 2 (Am. Complt.), Ex. A to Am. Complt. at 1-2; see also id., Ex. 3 (Pl. Dep. I), at 93:18-97:18.

93.   Plaintiff then appealed to Rep. Meeks Ms. Johnson's decision not to submit Plaintiff's overtime compensation request. Id., at 97:24-99:15.

94.   At a meeting on July 17, 2000 among Rep. Meeks, Josephine Johnson, and Plaintiff, Rep. Meeks denied Plaintiff's request for overtime compensation.  Id., at 98:18-99:23; id., Ex.

2 (Am. Complt.) ¶¶ 20-21, and Ex. A to Am. Complt. at 2.

95. After the meeting in which Rep. Meeks denied Plaintiff's request for overtime compensation, Rep. Meeks did not have a conversation with anyone in the Office about Plaintiff's overtime request. Levy Dec., Ex. 4 (Rep. Meeks Dep.), at 100:12-101:10.

### G. Staff Members' Complaints about Plaintiff's Behavior

96. Before Plaintiff returned to work, two members of Rep. Meeks' District Office management staff, Executive Assistant Patrick Jenkins and Office Manager Kim Fuller, reported to Rep. Meeks that Plaintiff was working elsewhere while she was absent from his Office on medical leave. Levy Dec., Ex. 4 (Rep. Meeks Dep.), at 118:11-22, 168:23-170:22.

97. At that time, it was Rep. Meeks' impression that Plaintiff was out on medical leave because she was physically unable to return to work. Id. (Rep. Meeks Dep.), at 170:12-15.

98. Rep. Meeks also heard reports that Plaintiff was in the office alone at night, on the computer, while she was out on medical leave. Id. (Rep. Meeks Dep.), at 118:15-22, 169:15-25; see also id., Ex. 5 (Deposition of Patrick Jenkins, taken on December 5, 2002 ("Jenkins Dep.")), at 43:22-45:2.

99. Upon Plaintiff's return to work, Rep. Meeks heard reports from staff members, including his District Office Chief of Staff Josephine Johnson, Patrick Jenkins, Kim Fuller and others, that Plaintiff's behavior had changed and that they felt uneasy or

uncomfortable working with Plaintiff and did not trust her any more. Levy Dec., Ex. 4 (Rep. Meeks Dep.), at 101:12-19, 102:13-23, 104:11-13, 116:10-13, 117:21-24, 118:8-10, 118:23-119:18, 170:23-176:18, 180:4-16; see also id., Ex. 5 (Jenkins Dep.), at 36:9-46:8; id., Ex. 7 (Deposition of Kim Fuller, taken on December 18, 2004 ("Fuller Dep.")), at 17:9-21:7, 25:13-26:15.

100. For example, staff members reported to Rep. Meeks that they thought that Plaintiff was eavesdropping on telephone conversations, looking in their desks, entering their offices when she was not supposed to, taking documents from them, photocopying documents, and spending time in the office alone late at night. Levy Dec., Ex. 4 (Rep. Meeks Dep.), at 102:17-21, 103:5-6, 117:20-24, 118:15-119:18; see also id., Ex. 5 (Jenkins Dep.), at 39:7-42:7, 43:22-45:2; id., Ex. 7 (Fuller Dep.)), at 19:21-20:7.

101. In fact, Patrick Jenkins, reported to Rep. Meeks that he planned to put a lock on his office door because of Plaintiff's "snooping around." Levy Dec., Ex. 4 (Rep. Meeks Dep.), at 119:11-18, 171:5-19; see also id., Ex. 5 (Jenkins Dep.), at 45:6-46:8.

102. Staff members also reported to Rep. Meeks that Plaintiff "did not have his back," (i.e., that she was being disloyal). Levy Dec., Ex. 4 (Rep. Meeks Dep.), at 102:17-23, 180:4-16.

103. As a result of Plaintiff's behavior, District Office Chief of Staff Josephine Johnson, then-Executive Assistant Patrick Jenkins, and then-District Office Manager Kim Fuller recommended to

Rep. Meeks that Plaintiff be terminated.  Id. (Rep. Meeks Dep.), at 101:16-17, 102:13-16, 117:20-21, 175:3-176:18; see also id., Ex. 7 (Fuller Dep.), at 26:24-33:5.

104.  Despite the complaints and recommendations that he received from his staff, Rep. Meeks refused to fire Plaintiff at that time because Plaintiff continued to perform her work well. Id., Ex. 4 (Rep. Meeks Dep.), at 101:16-19, 102:22-103:3, 117:20-118:3.

**H.  Change in Office Overtime Policy**

105.  In early 2000, Rep. Meeks requested that his Chief of Staff, Jameel Aalim-Johnson, investigate which positions in the Office, including Community Liaisons, were entitled to overtime compensation.  Levy Dec., Ex. 4 (Rep. Meeks Dep.), at 18:2-19:11; Levy Dec., Ex. 6 (Deposition of Jameel Aalim-Johnson, taken on December 11, 2002 ("A-Johnson Dep."), at 12:7-13:11; A-Johnson Dec. ¶ 20.

106.  Mr. Aalim-Johnson determined that staff performing the duties that Plaintiff performed in her position as Community Liaison were exempt from the overtime requirements of the Fair Labor Standards Act.  Id., Ex. 4 (Rep. Meeks Dep.), at 18:25-20:21; Id., Ex. 6 (A-Johnson Dep.), at 12:14-13:11; A-Johnson Dec. ¶ 20, and Ex. J thereto.

107.  Starting in about September 2000, Community Liaisons employed by the Office were no longer paid overtime compensation

for outside meetings that they attended at which they represented Rep. Meeks outside of office hours. Levy Dec., Ex. 4 (Rep. Meeks Dep.), at 17:8-18:5, 19:13-20:9; id., Ex. 6 (A-Johnson Dep.), at 10:9-13:11; A-Johnson Dec. ¶ 21, and Ex. K thereto.

## I. **Plaintiff's Overtime Complaint to the Office of Compliance**

108.   On or about September 8, 2000, Plaintiff filed a complaint under the Congressional Accountability Act with the Office of Compliance, claiming that she had been improperly denied overtime compensation. Levy Dec., Ex. 3 (Pl. Dep. I), at 106:3-107:10; 116:12-119:10 (describing OOC complaint forms attached to Original Complaint); Id., Ex. 1 (Orig. Complt), Ex. G and J thereto; Id., Ex. 9 (P10031-32 and P100047) (signed copy of complaint produced by Plaintiff in discovery)); Id., Ex. 12 (D171-172).

109.   Pursuant to the OOC rules, a confidential 30-day period of "counseling" follows the filing of a complaint, during which time the employer is not notified of the complaint unless the complainant signs a confidentiality waiver. Levy Dec., Ex. 14 (OOC Rules of Procedure) §§ 1.06, 1.07(a), 2.03(c), 2.03(j).

110.   There is no evidence that Plaintiff signed a confidentiality waiver for her overtime complaint to the OOC. Levy Dec., Ex. 12 (D171-172)(declaration by OOC custodian of records describing the OOC record does not include any reference to a confidentiality waiver in this case); id., Ex. 3 (Pl. Dep. I), at

107:11-108:6 (Plaintiff testified about her understanding of a "waiting period" and "cooling off period"), 108:25-109:2 (Plaintiff described her understanding that the process was confidential); 120:18-121:9 (Plaintiff testified that on or about October 10, 2000, she "didn't feel that anything was happening . . . with the Office of Compliance because [she] was still engaged in this waiting process" and thus wrote a letter to the House Ethics Committee at that time).

111.  According to Plaintiff, before her termination, Plaintiff did not talk with anyone in the Office about her complaint with the OOC concerning overtime compensation.  Levy Dec., Ex. 3 (Pl. Dep. I), at 108:21-24; 112:1-6.

112.  Before Plaintiff's termination, the Office was not aware of Plaintiff's complaint with the OOC concerning overtime compensation.  Levy Dec., Ex. 4 (Rep. Meeks Dep.), at 96:19-98:17; id., Ex. 6 (A-Johnson Dep.), at 19:22-20:17, 44:7-45:8.

## J.  Plaintiff's Letter to the Committee on Standards of Official Conduct of the House of Representatives

113.  By letter dated October 10, 2000, Plaintiff wrote to the Committee on Standards of Official Conduct of the House of Representatives.  Levy Dec., Ex. 2 (Am. Complt.) ¶ 24; id., Ex. 3 (Pl. Dep. I), at 119:23-120:9 (describing Exhibit I to Orig. Complt.); id., Ex. 1 (Orig. Complt.), Ex. I; repeated at id., Ex. 2 (Am. Complt.), Attachment A thereto.

114.  In her letter, Plaintiff claimed, inter alia, that the

Office had wrongfully denied her overtime compensation. Levy Dec., Ex. 2 (Am. Complt.) ¶ 24; id., Ex. 3 (Pl. Dep. I), at 119:23-120:9 (describing Exhibit I to Orig. Complt.); id., Ex. 1 (Orig. Complt.), Ex. I; repeated at id., Ex. 2 (Am. Complt.), Attachment A thereto.

115. Plaintiff never heard from the House Ethics Committee in response to her October 10, 2000 letter. Id., Ex. 3 (Pl. Dep. I), at 124:2-6.

116. Plaintiff is not aware of any action being taken by the House Ethics Committee in response to her letter. Id., at 123:16-124:1.

117. The Office did not receive any notification of, and was not made otherwise aware of, Plaintiff's letter to the House Ethics Committee before Plaintiff's termination. Id., Ex. 6 (A-Johnson Dep.), at 22:7-22, 24:5-25:6; id., Ex. 4 (Rep. Meeks Dep.), at 89:11-92:13; see id. (Rep. Meeks Dep.), at 91:16 ("from my recollection, it was after" Plaintiff was no longer employed).

**K.   Plaintiff's Termination - October 23, 2000**

118. Rep. Meeks terminated Plaintiff's employment on October 23, 2000. A-Johnson Dec. ¶ 8, and Ex. D thereto; see also Levy Dec., Ex. 3 (Pl. Dep. I), at 165:14-168:23; id., Ex. 4 (Rep. Meeks Dep.), at 101:11-119:23].

119. Plaintiff was terminated based on a combination of factors, including the complaints that Rep. Meeks had received from

trusted members of his District Office management staff, and his receipt of a draft letter that Plaintiff had written that questioned the integrity of his Office on grounds unrelated to Plaintiff's claim for overtime compensation. Id. (Rep. Meeks Dep.), at 101:11-119:23, 168:23-180:19.

120.  Whereas Rep. Meeks had heard complaints previously and had received recommendations from his staff that he terminate Plaintiff's employment, he had refused to do so because she was performing good work. Id. (Rep. Meeks Dep.), at 101:12-19, 102:10-103:10, 117:20-118:3; see also id., Ex. 7 (Fuller Dep.), at 26:24-33:5.

121.  However, the draft letter that questioned Rep. Meeks' Office's integrity corroborated the complaints he had received, including the complaints that Plaintiff "did not have [his] back." See id., Ex. 4 (Rep. Meeks Dep.), at 102:17-23, 180:4-16.

122.  As Rep. Meeks testified, "[W]hen I read that letter, that letter was confirmation to me, . . . of what people had said, that she was snooping around . . . people's desks and questioning the integrity of my office, and I can't have an employee in the office questioning the integrity of the office and I felt because of that letter and what other people told me, she had to go." Id. (Rep. Meeks Dep.), at 103:3-10; see also id., at 101:11-104:21, 116:10-118:10.

123.  Neither Rep. Meeks nor the Office retained a copy of the

draft letter.  Id. (Rep. Meeks Dep.), at 104:22-105:9.

124.  Rep. Meeks did not consult with anyone before deciding to terminate Plaintiff.  Id. (Rep. Meeks Dep.), at 112:15-113:21.

125.  Rather, with Patrick Jenkins and Josephine Johnson present, he called Plaintiff into his office and asked her to "pack up [her] stuff," because "people were uneasy, it was not lending to an atmosphere that I wanted to have in the office."  Id. (Rep. Meeks Dep.), at 114:3-115:6; id., Ex. 5 (Jenkins Dep.), at 33:23-36:4; id., Ex. 3 (Pl. Dep. I), at 165:14-168:23.

126.  In response to Plaintiff's question, Rep. Meeks told Plaintiff that there were no complaints about her work.  Id., Ex. 4 (Rep. Meeks Dep.), at 115:7-116:13.

127.  In addition to her regular salary through October 23, 2000, on November 1, 2000, the Office paid Plaintiff a lump sum in the amount of $1,816, representing three days of accrued leave time and two weeks of additional salary.  Id., Ex. 6 (A-Johnson Dep.), at 39:23-41:22; A-Johnson Dec. ¶ 9, and Ex. E thereto.

**II.  Plaintiff's OOC Complaints**

    **A.  Plaintiff's Termination Complaint to the OOC**

128.  On October 23, 2000, Plaintiff filed a complaint with the OOC claiming that her termination was improper.  Levy Dec., Ex. 3 (Pl. Dep. I), at 106:9-11, 110:23-111:12, 124:7-125:5; id., Ex. 13 (D169-170); id., Ex. 1 (Orig. Complt.), Ex. J thereto; repeated at Levy Dec., Ex. 9 (P100046 and P100048).

129.   On October 26, 2000, Plaintiff agreed to reduce the period for counseling on her termination complaint.  Levy Dec., Ex. 3 (Pl. Dep. I), at 125:6-126:7; id., Ex. 13 (D169-170); id., Ex. 1 (Orig. Complt.), Ex. J thereto; repeated at id., Ex. 9 (P100049); see also id., Ex. 14 (OOC Rule of Procedure) § 2.03(j)(period for counseling is 30 days, unless employee and Office agree to reduce period).

130.   Plaintiff received a Notification of End of Counseling on the termination complaint on November 6, 2000.  Levy Dec., Ex. 3 (Pl. Dep. I), at 131:4-12 (referencing P100051-52); id., Ex. 9 (P100051-52); id., Ex. 13 (D169-170); see OOC Rule of Procedure § 2.03(l)(rule governing notification of end of counseling).

131.   In the letter, OOC advised Plaintiff that if she wished to pursue her claim, she was required to file a request for mediation with the OOC.  Levy Dec., Ex. 9 (P100051-52); id., Ex. 3 (Pl. Dep. I), at 131:13-132:11.

132.   Plaintiff requested mediation of the termination complaint on November 14, 2000.  Levy Dec., Ex. 3 (Pl. Dep. I), at 131:22-132:11 (referencing P100053); id., Ex. 9 (P100053); id., Ex. 13 (D169-170).

**B.   Request for Mediation of OOC Overtime Complaint**

133.   On or about October 24, 2000, Plaintiff received a Notification of End of Counseling on the overtime complaint from the OOC.  Levy Dec., Ex. 9 (P100042-44); id., Ex. 12 (D171-172).

134.   On November 1, 2000, Plaintiff requested mediation of the overtime complaint.  <u>Id.</u>, Ex. 12; <u>id.</u>, Ex. 3 (Pl. Dep. I), at 111:17-20 (Plaintiff testified that mediation on overtime complaint did not begin before termination).

### C.   OOC's First Notification to Office of Plaintiff's Complaints

135.   Under the OOC's rules of procedure, in the absence of a confidentiality waiver, the request for mediation is the very first trigger for the OOC to notify an Employing Office of an OOC complaint.  Levy Dec., Ex. 14 (OOC Rule of Procedure § 2.04(c).

136.   After the termination of Plaintiff's employment, in or about late October to early November 2000, the OOC advised Jameel Aalim-Johnson of Plaintiff's complaints against the Office of Representative Meeks.  Levy Dec., Ex. 6 (A-Johnson Dep.), at 19:22-20:17, 44:7-12.   Mr. Aalim-Johnson was the appropriate point of contact in the Office for the OOC and this was the first time that Mr. Aalim-Johnson heard about Plaintiff's OOC complaints.  <u>Id.</u> (A-Johnson Dep.), at 44:7-45:8; <u>see id.</u>, Ex. 4 (Rep. Meeks Dep.), at 98:7-17(Rep. Meeks vested responsibility in Mr. Aalim-Johnson for handling complaints such as OOC complaint); <u>cf. id.</u> (Rep. Meeks Dep.), at 91:21-92:11 (Rep. Meeks vested responsibility in Mr. Aalim-Johnson for handling complaints such as House Ethics Committee complaint).

137.   Mr. Aalim-Johnson subsequently advised Rep. Meeks of Plaintiff's complaints to the OOC.  <u>Id.</u> (A-Johnson Dep.), at 45:18-

46:25; id., Ex. 4 (Rep. Meeks Dep.), at 96:19-98:17].

138.   This was the first time that Rep. Meeks heard about Plaintiff's OOC complaints.  Id. (Rep. Meeks Dep.), at 96:19-98:17.

### D. **Mediation of Plaintiff's OOC Complaints**

139.   Between November 2000 and January 2001, mediation of Plaintiff's OOC complaints ensued between the parties, but did not result in a settlement of the case.  Levy Dec., Ex. 3 (Pl. Dep. I), at 113:9-114:7; see id., Ex. 14 (OOC Rule of Procedure) § 2.04 (section concerning mediation).

140.   By letter dated January 8, 2001, which Plaintiff received on January 27, 2001, the OOC notified Plaintiff of the end of the mediation period and advised Plaintiff of her right to file a judicial action.  Levy Dec., Ex. 1 (Orig. Complt.), first exhibit; repeated at id., Ex. 9 (P100064-66); id., Ex. 12 (D171-172); id., Ex. 13 (D169-170).

## III. **District Court Complaint**

141.   On or about March 8, 2001, Plaintiff commenced this action, pro se, and on or about June 15, 2001, Plaintiff, represented by counsel, filed an Amended Complaint.  Levy Dec., Exs. 1 and 2 (Orig. and Am. Complts.).

142.   In her Amended Complaint, Plaintiff's primary claims are that:  (1) she was improperly denied overtime compensation, Levy Dec., Ex. 2 (Am. Complt.) ¶¶ 22-24; (2) that she was terminated "in retaliation for her filing of the lawsuit against Flowers and/or in

retaliation for her complaint filed with the Office of Compliance and/or in retaliation for her complaint filed with the [House Ethics Committee]," id. ¶ 27; and (3) she was improperly denied travel expense reimbursement, id. ¶¶ 22-24.

143.  In or about May 2000, Plaintiff commenced a legal action against, inter alia, a physical therapy facility owned by Neville Flowers, and Neville Flowers, individually.  See Levy Dec., Ex. 2 (Am. Complt.) ¶ 15.

144.  Plaintiff asserted separate claims against the Office and Rep. Meeks individually.  Id. (Am. Complt.) ¶¶ 29-32; see Stipulation and Partial Order of Dismissal, entered November 19, 2001 (dismissing first claim against Meeks and second claim against Office).

145.  Rep. Meeks moved to dismiss the claim against him individually on the grounds that it was precluded by the Congressional Accountability Act.  See Payne v. Meeks, 200 F. Supp. 2d 200 (E.D.N.Y. 2002).

146.  By Memorandum and Order dated May 1, 2002, the Court granted Representative Meeks' motion, holding that Plaintiff's claim of unconstitutional discharge was precluded by the CAA.  Id.

147.  Plaintiff has taken extensive discovery in this action. Levy Dec. ¶ 2.

148.  In response to Plaintiff's discovery requests, the Office responded to two sets of interrogatories and three sets of

document requests, producing at least 1,800 pages of documents (including documents in the possession, custody or control of the Office, documents subpoenaed from third parties, and documents produced in expert discovery). Id.

149.   The Office produced seven witnesses for deposition, including Representative Meeks, his Chief of Staff Jameel Aalim-Johnson, his District Director Patrick Jenkins, and four other current or former employees. Id.

150.   Plaintiff also took the deposition of two non-party witnesses. Id.

151.   In addition, Plaintiff testified at deposition for almost two days. Id.

Dated:     Brooklyn, New York
           December 2, 2004

                         ROSLYNN R. MAUSKOPF
                         United States Attorney
                         Eastern District of New York
                         One Pierrepont Plaza, 14th Floor
                         Brooklyn, New York 11201

           By:      _____
                         SANDRA L. LEVY (SL-9874)
                         Assistant United States Attorney
                         (718) 254-6014

To:   David N. Mair
      Kaiser, Saurborn & Mair, P.C.
      20 Exchange Place
      New York, NY 10005

UNITED STATES DISTRICT COURT
Eastern District of New York

Civil Action          No. 01-1532

ANDREA T. PAYNE,

    Plaintiff,

-against-

OFFICE OF GEORGE W. MEEKS ET AL.

    Defendants.

**Statement Pursuant to Local Rule 56.1**

ROSLYNN R. MAUSKOPF
United States Attorney,
Attorney for Defendant,
Office and Post Office Address,
United States Courthouse
One Pierrepont Plaza
Brooklyn, New York 11201

Due service of a copy of the within _____ is hereby admitted.

Dated: _____ 20___

_____
Attorney for Defendant _____

SANDRA L. LEVY, AUSA
718-254-6014

---

**SIR:**

**PLEASE TAKE NOTICE** that the within will be presented for settlement and signature to the Clerk of the United States District Court in his office at the **UNITED STATES DISTRICT COURT U.S. Courthouse, 225 Cadman Plaza East, EASTERN DISTRICT OF NEW YORK** Brooklyn, New York, on the _____ day of _____ 20___ at 10:30 o'clock in the forenoon.

Dated: Brooklyn New York, _____ 20___

United States Attorney,

Attorney for _____

To:

Attorney for _____

**SIR:**

**PLEASE TAKE NOTICE** that the within is a true copy of _____ duly entered herein on the _____ day of _____ 20___ in the office of the Clerk of the Eastern District of New York.

Dated: Brooklyn, New York,

United States Attorney,

Attorney for _____

To:

Attorney for _____